**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

VENEQUIP, S.A.,

      Plaintiff,

v.

CATERPILLAR, INC.,

      Defendant.

_____/

**<u>COMPLAINT</u>**

Plaintiff Venequip, S.A. ("Venequip"), a Venezuelan corporation, for its Complaint against

Caterpillar, Inc. ("CAT"), a Delaware corporation, states as follows:

**I.**       **<u>Introduction</u>**

1.       This is an action seeking redress for CAT's surreptitious and ultimately successful

scheme to stab Venequip in the back through disloyal, misleading, and fraudulent practices.

2.       At all times relevant to this complaint, Venequip was CAT's sole authorized dealer

in Venezuela. This was more than just a run-of-the-mill, buy-sell arrangement between a

manufacturer and its dealer—it was a long-standing relationship of trust and confidence. CAT and

Venequip worked very closely together, for over 90 years, to develop and expand the market in

Venezuela for CAT's equipment and parts. CAT executives and other personnel frequently came

to Venezuela to meet with Venequip personnel and visit Venequip's facilities and key customers

in Venezuela, worked with Venequip executives and other personnel to develop multi-year joint

marketing plans and initiatives, reviewed and approved Venequip's expansion and investments in

the Venezuelan market for the sale and servicing of CAT's equipment and parts, and developed warm personal relationships with Venequip's principals.

3.      CAT induced Venequip to believe that CAT: (a) was committed to a long-term relationship of trust and confidence with Venequip in Venezuela; (b) never would undermine or hinder Venequip's ability to sell CAT equipment and parts in Venezuela; (c) never would directly or indirectly facilitate or encourage dealers in other countries, let alone unauthorized resellers, to enter or sell in the Venezuelan market; and (d) never would engage in disloyal, misleading, and fraudulent practices. CAT knew that Venequip would rely upon its representations, and Venequip did in fact rely upon them.

4.      Through its oral and written representations, conduct, and policies, CAT repeatedly and affirmatively caused Venequip to believe, *inter alia*, that: (a) Venequip was CAT's sole authorized Venezuelan dealer; (b) CAT's pricing to Venequip was fair and thus the same (or close to the same) as the pricing CAT offered its other dealers, which meant that other dealers would not be able to undercut Venequip by invading the Venezuelan market; and (c) CAT prohibited resellers from selling CAT products, which again meant that resellers would be unable to invade the Venezuelan market. Again, CAT knew and intended that Venequip would rely upon these representations, and Venequip did in fact rely upon them.

5.      Believing that CAT was its trusted partner, would not act to undermine Venequip, and was fully committed to jointly developing and expanding the market for CAT equipment and parts in Venezuela, Venequip invested tens of millions of dollars and developed a robust infrastructure for the sale, marketing and servicing of only CAT equipment and parts in Venezuela. Venequip did not sell other brands. Instead, consistent with the relationship fostered over many decades, Venequip structured its business entirely around CAT's needs and expectations. As a

result of Venequip's efforts, CAT became the leading brand in Venezuela, an important market for CAT, and was recognized as the leader in the most relevant Venezuelan industry segments such as oil, gas, mining and construction.

6.      CAT affirmatively informed Venequip that CAT recognized, approved and encouraged Venequip's efforts, including that Venequip had: (a) invested millions of dollars in its infrastructure throughout Venezuela; (b) solidified its strong position with the government by maintaining direct access to key government officials; (c) strong product support that was well-recognized by customers in Venezuela; and (d) a historical track record in the country having survived economic downturns.

7.      CAT affirmatively represented to Venequip that CAT believed that Venequip had professionally and skillfully maneuvered the deteriorating political and economic conditions in Venezuela to position CAT well in the future with Venequip in Venezuela. As such, CAT affirmatively represented to Venequip that CAT remained "actively engaged and visiting Venezuela despite its challenges."

8.      Unbeknownst to Venequip, CAT's repeated representations to Venequip that CAT would not undermine Venequip in Venezuela were lies and its effusive praise of Venequip was designed to lull Venequip into believing that CAT was Venequip's trusted and committed partner. In fact, Venequip discovered that CAT knowingly and intentionally facilitated invading sales in Venezuela to Venequip's detriment by: (a) providing other dealers with materially lower prices than it provided to Venequip, knowing that such dealers could and did take advantage of this price disparity to successfully sell CAT products outside their own markets and instead into Venezuela; (b) allowing unauthorized resellers to sell CAT products in Venezuela; and (c) lulling Venequip

to believe that these invading sales and price disparities were anomalies so that Venequip would refrain from acting to protect its interests.

9.      Eventually, Venequip discovered CAT's lies. It then confronted CAT. CAT did not deny its conduct but still refused to work with Venequip to address Venequip's concerns. Instead, CAT responded through retaliation. Not only did CAT terminate the relationship and refuse to sell to Venequip, but CAT also barred and/or discouraged other dealers and sellers of CAT equipment and parts from selling to and doing business with Venequip.

10.     CAT's disloyal, misleading, and fraudulent practices: (a) decimated Venequip's business, preventing Venequip from selling CAT products and servicing CAT equipment; and (b) harmed consumers of CAT equipment and parts in Venezuela. As a result, Venequip has suffered many millions in damages.

## II.      Parties

11.     Plaintiff Venequip, S.A. is a corporation organized under the laws of Venezuela and with its principal place of business in Venezuela. Venequip's headquarters are in Barquisimeto, a city in the state of Lara, Venezuela. Venequip is a prominent engineering, procurement, and construction company as well as a leader in distribution of industrial machinery, heavy equipment, parts and specialized technical services.

12.     Venequip was established in Caracas, Venezuela, in 1927 under the name International General Electric de Venezuela, S.A., an affiliate of General Electric. From inception, it acted as CAT's only authorized distributor in Venezuela.

13.     Defendant Caterpillar, Inc. is a construction, mining, and other equipment manufacturing corporation incorporated in Delaware. CAT is currently headquartered and has its

principal place of business in Texas. CAT conducts business across the United States, including in Florida, where it maintains an office in Miami, Florida.[1]

14.    CAT is one of the largest manufacturers of heavy machinery and engines in the world. It trades on the New York Stock Exchange under the symbol "CAT." It has a market capitalization of over $170 billion.

15.    CAT is the parent holding company and uses a network of interconnected U.S. and offshore subsidiaries to conduct its business. All subsidiaries act at the direction of and are controlled by CAT. As detailed in this complaint, with respect to the relationship with Venequip, CAT used its Swiss entity to enter into dealership contracts, and it used other entities in the United States and Mexico to provide financing to Venequip's affiliates.

16.    CAT has been the target of numerous lawsuits and government investigations throughout its history, especially in recent years, including for conduct resembling the facts at issue in this case. For example, in April 2024, a Delaware jury handed down a $100 million verdict against CAT for interfering in a competitor's ability to import and sell heavy machinery.

17.    Further, CAT's use of its offshore subsidiaries was the subject of a sprawling U.S. Senate investigation. The U.S. Senate's Permanent Subcommittee on Investigations issued a detailed report in 2014 discussing CAT's use of its Swiss subsidiary—more on this entity later— to avoid paying approximately $2.4 billion in taxes to the U.S. government from around 2000 to 2010. In a nutshell, CAT traditionally uses its Swiss entity to enter into agreements with foreign dealers and act as the seller of the equipment, thereby parking that revenue in Switzerland and avoiding the payment of U.S. income tax on sales of equipment to foreign dealers.

---

[1]  *See* Caterpillar U.S. Locations, available at https://www.caterpillar.com/en/company/global-footprint/americas/united-states.html.

18.     That investigation resulted in CAT paying a $1 billion penalty to the IRS, shareholder lawsuits against CAT, and a criminal referral to the Justice Department. In March 2017, the DOJ conducted raids on three of CAT's main offices in connection with that criminal investigation. CAT hired William Barr, who a year later was nominated to be Attorney General. Following his nomination, DOJ purportedly killed the investigation. In March 2024, the U.S. Senate Committee on Finance announced a new investigation involving CAT's efforts and tactics to kill the DOJ criminal investigation for tax evasion.

19.     Importantly, in March 2024, the Chairmen of the Senate Committees on Finance and on the Budget sent a letter to the DOJ inquiring about CAT's efforts to obstruct and interfere in the criminal tax investigation. According to the letter, "It appears that CAT's lawyers, including former DOJ officials, enjoyed frequent access to the highest levels of DOJ leadership as they successfully lobbied the Department to shut down a criminal investigation." The Senate characterized this as CAT receiving a "sweetheart deal . . . potentially including a tax controversy involving billions of dollars."[2]

### III.     Jurisdiction and Venue

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because this is an action between a citizen of a State and a citizen or subject of a foreign state for legal and equitable relief, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because CAT is subject to the personal jurisdiction of this Court.

---

[2] https://www.finance.senate.gov/imo/media/doc/wyden_whitehouse_doj_caterpillar_letter.pdf

22.     CAT is subject to personal jurisdiction before this Court pursuant to Section 48.193, Florida Statutes, because it engages in substantial and not isolated activity within Florida. Indeed, CAT previously has admitted that it "regularly and systematically conducts business in the State of Florida directly and through its authorized vendors." Further, CAT is registered with the Florida Secretary of State as a foreign corporation authorized to conduct business within Florida.

IV.     **Factual Allegations**

A.     **Venequip Successfully Operated for Almost a Century in Venezuela**

23.     Throughout its history, and as CAT repeatedly recognized, Venequip has been led by strong and competent management, has enjoyed tremendous commercial success, and has proven sufficiently nimble and strategic so as to overcome numerous economic and political problems that have plagued Venezuela.

24.     Venequip was more than once ranked as a top 50 company in Venezuela, according to "Business Venezuela," a magazine published by the Venezuelan American Chamber of Commerce. Venequip has successfully navigated a complicated business environment where, as CAT's own executives recognized, many others have failed. As discussed below, in emails to Venequip, several senior CAT executives congratulated Venequip for being able to successfully continue to thrive despite many economic and structural difficulties in Venezuela.

25.     Indeed, while Venezuela presents a challenging economic and legal landscape, it simultaneously has enormous commercial potential. For example, Venezuela has the largest proven oil reserves in the world, in addition to one of the largest proven gas reserves.

26.     In the 21st century, Venezuela's challenges began in or about 2003 with a wave of nationalizations and other measures by the government coupled with political turmoil caused by an attempted coup against then President Chavez. However, the Venezuelan economy by and large

continued growing throughout the first decade of the 21ˢᵗ century mainly as a result of the significant increase in the price of oil, which is Venezuela's largest export.

27.      Importantly, while Venezuela's government's measures created legal uncertainty, they also shifted the primary business activities to the government. For example, Petróleos de Venezuela, S.A. ("PDVSA"), the Venezuelan national oil and gas company and one of the leading oil and gas producers in the world, became the single largest customer for oil and gas equipment in the country.  That created an enormous commercial opportunity for both Venequip and CAT.

**B.      The CAT-Venequip Partnership**

i.      Background

28.      Venequip's history is tied to CAT. CAT was established in 1925 and Venequip (under its prior name) was established just two years later, in 1927. Since its inception, Venequip acted as the only CAT dealer in Venezuela.

29.      In 1991, two Venezuelan groups led by the Bellosta and the Sosa families, respectively, purchased the company from General Electric. CAT approved this transaction and expressly allowed Venequip to continue acting as its sole Venezuelan distributor under the new owners. Carlos Bellosta Sr. became the manager of the Venequip business. At that time, Venequip had approximately 300 employees and approximately 80 technicians specialized in CAT equipment.

30.      During the 1990s, the new owners paid down the company's debt, which was substantial, and expanded into new sectors, including distributing equipment for the expanding Venezuelan oil and gas industry. Venequip grew exponentially. Its annual sales grew from approximately $50 million in 1997 to approximately $200 million just five years later, in 2002.

31.    With CAT's knowledge, encouragement, and approval, Venequip spent tens of millions of dollars in developing CAT's market presence, brand recognition, and service infrastructure in Venezuela. Significantly, Venequip developed a large network of state-of-the-art service shops for CAT machinery and engines across Venezuela, and also created a vast network of technical personnel and specialists to service CAT equipment. CAT certified most of Venequip's service shops with "five stars," which is the highest possible rating.

32.    As a result of Venequip's efforts for close to a century, CAT became the dominant and leading brand in the country for heavy machinery and engines. In fact, Venezuelan customers preferred CAT not only because of the quality of its products and its brand recognition but all the more so because CAT always had the backing and support of Venequip as a responsible, competent, responsive, and up-to-date organization.

33.    Even in the face of economic and political challenges in Venezuela, CAT and Venequip worked together to continue expanding CAT's market share and presence in Venezuela. At every turn, CAT affirmatively induced Venequip to believe that it would continue to work together in the long-run and that their relationship would withstand any local challenges. More importantly, CAT caused Venequip to believe that it would assist Venequip in reaching the common goal of establishing and maintaining CAT as the dominant heavy machinery and engine brand in Venezuela, including growing the business with key government customers such as PDVSA.

34.    In turn, Venequip continued investing heavily in Venezuela and attempted to grow CAT's market presence. From 2014 to 2019, with CAT's knowledge, approval, and encouragement, Venequip invested more than $55 million in improving its offices, service shops, personnel and infrastructure to service CAT equipment in Venezuela.

35.     By 2019, when CAT purported to terminate its relationship with Venequip, Venequip: (a) had 10 branches and service shops in Venezuela for providing specialized maintenance and repair to CAT equipment; (b) led a team of over 600 workers, including more than 250 technicians specialized in servicing CAT products, all of them trained by Venequip; and (c) had more than 100 service trucks.

36.     All told, Venequip spent in excess of $100 million from the 1990s until 2019 in building and maintaining in Venezuela one of the most sophisticated and best CAT service networks in the world. Venequip had a stellar reputation and was known for the quality of its services in Venezuela. For example, Venequip served and sold the power generators for many of the embassies in Venezuela. Indeed, Venequip was responsible for rebuilding and repairing the power plants of the U.S. Embassy in Caracas in 2015.

37.     As a result of decades of hard work and tens of millions of dollars in investments, Venequip positioned CAT as the leading machinery brand in the Venezuelan oil and gas, power generation, and construction industries. Due to Venequip's efforts, by 2019: (a) approximately 90% of all the oil platforms in Venezuela used CAT equipment; (b) CAT power generators produced approximately 62% of the electricity consumed in Venezuela through the governmental electrical grid; (c) approximately 60% of the gas compression equipment in Venezuela used CAT engines; and (d) countless infrastructure projects such as roads across the country were built with CAT equipment.

      ii.     CAT Approved of Cooperatives to Service CAT Equipment

38.     To further cement their relationship, CAT and Venequip worked closely together to develop a stable workforce of specialized technicians to service CAT's equipment in Venezuela. This provided significant benefits to CAT, as prospective purchasers of heavy machinery and

engines would be more likely to buy: (a) CAT equipment, if assured that CAT-authorized technicians were available in-country to service the equipment; and (b) CAT replacement parts, when the equipment was serviced.

39.     In 2000-2001, Venequip implemented a creative model through which it would share the profits of its business with its workforce. To that end, Venequip incentivized its employees to create cooperatives to service CAT's equipment in Venezuela. Eventually, more than 20 cooperatives worked with Venequip to service CAT's equipment in the country.

40.     Recognizing that the cooperatives would further entrench CAT in Venezuela, CAT affirmatively supported Venequip's efforts and approved the plan of working with the cooperative model.

41.     With CAT's knowledge, encouragement, and support, Venequip's relationship with the cooperatives expanded significantly. In 2014, Venequip and its cooperatives entered into a joint venture agreement under which the joint venture entity would be responsible for providing services to all CAT equipment in Venezuela. CAT approved the creation of this joint venture.

42.     In 2017, CAT also consented to the joint venture entity acting as a second level dealer of CAT equipment in Venezuela, along with Venequip.

43.     CAT's actions intentionally and knowingly led Venequip to believe that Venequip would continue acting in the long-term as CAT's only authorized dealer in the country. Indeed, Venequip and its cooperatives structured their business model and relationship around CAT, with CAT's approval. Thus, CAT knew, approved, and encouraged Venequip to further tie its fortunes to CAT—both as a seller and a servicer of CAT equipment.

### iii.   2004 Agreements Between Venequip and CAT's Swiss Affiliate

44.     CAT and Venequip's dealership relationship under Venequip's prior ownership dates back to in or about 1927. In 2004, Venequip entered into a new set of dealership agreements affirming that Venequip would be the authorized dealer of CAT equipment in Venezuela. The agreements did not have an expiration date, although they allowed for termination subject to a notice period. The agreements were signed shortly after Venezuela had entered a period of intense political turmoil, including a wave of nationalizations, as discussed above. In recognition of Venequip's strong personal relationships with CAT, and its history of success on behalf of CAT, CAT reaffirmed its commitment to continuing to develop its long-term relationship with Venequip in Venezuela.

45.     The 2004 agreements were signed by CAT SARL. This is an offshore entity that CAT uses to collect revenue from its foreign dealers. CAT was not a party to the 2004 agreements.

46.     As noted earlier, according to public sources, CAT's use of its Swiss affiliate has been part of a larger tax evasion scheme for which CAT has been subject to criminal investigation, and for which CAT has paid an enormous, *billion*-dollar fine.

47.     In particular, CAT SARL and Venequip signed two agreements: one for heavy machinery (*e.g.*, trucks, dozers and excavators) and engines (*e.g.*, power generators) and another for replacement parts. In essence, the agreements gave Venequip the ability to buy CAT equipment and parts for sale in Venezuela.

48.     The agreements locked Venequip into selling only CAT's equipment by barring Venequip from acting as dealer in Venezuela for any of CAT's competitors. Again, Venequip's entire business was—and now had to be—structured entirely around CAT.

49.     CAT SARL also issued authorizations for Venequip's affiliates in Curaçao and in the United States to act as representatives of Venequip in the sale of CAT equipment so that Venequip could expand its reach to international companies doing business in Venezuela.

50.     In parallel to the agreements regarding the Venezuelan market and in recognition of Venequip's good work and effort, CAT assigned new territories and the parties expanded their relationship to other countries. In particular, CAT SARL signed the same pair of agreements with Venequip Curazao N.V., a Venequip affiliate, for the sale of CAT machinery, engines and parts in Aruba, Bonaire, and Curaçao.

iv.     CAT's Financing to Facilitate Venequip's Purchase of CAT's Equipment

51.     Historically, CAT (through subsidiaries) provided financing to Venequip and certain of its affiliates. The purpose of the financing was, *inter alia*, to facilitate Venequip's ability to increase its purchases of CAT equipment, leading to an increase of CAT's market share and sales in Venezuela.

52.     CAT made several separate loans from 2005 to 2015. By 2015, the loans collectively reached approximately $110 million.

53.     In or around 2015, PDVSA, one of Venequip's most important customers, fell behind on paying for the CAT equipment that Venequip sold to it, thus causing difficulties in the Venequip affiliates' ability to repay the loans provided by CAT's lending entities.[3]

54.     Reaffirming its commitment to CAT and in reliance upon CAT's continuing representations of its commitment to Venequip as its sole Venezuelan distributor, Venequip

---

[3] This has resulted in litigation by CAT's lending affiliates against Venequip's affiliates in several jurisdictions.

engaged in significant efforts to repay CAT and to seek other sources of financing to enable its repayment of CAT. CAT was aware of and encouraged Venequip's efforts on this score.

55.     Eventually, with CAT's knowledge, approval, and encouragement, Venequip, over a two-year period involving substantial negotiations and reliance on multiple outside law firms, arranged for a third-party bank to provide credit facilities to PDVSA: (a) to assist PDVSA in discharging its financial obligations to Venequip; and, in turn, (b) ensure payment to CAT's lending entities.

56.     CAT directly benefitted from this arrangement through payments made to CAT for equipment Venequip had purchased and then sold to PDVSA.

                v.      <u>CAT Requires Venequip to Pay for Political Risk Insurance Coverage, Falsely Representing it Would Cover for Losses Attributable to Adverse Venezuelan Government Action</u>

57.     Starting in or around 2005 and in relation to CAT's financing of Venequip's purchase of CAT's equipment, CAT informed Venequip that Venequip would have to pay for political risk insurance that CAT would procure. While CAT obligated Venequip to pay the policy premiums, CAT was responsible for obtaining the policies.

58.     CAT repeatedly represented to Venequip that the political risk insurance policies would cover any Venezuelan government action impairing Venequip's business or ability to repay the loans to CAT. Given the long-standing relationship of trust and confidence between CAT and Venequip, Venequip relied upon CAT's representations regarding the broad scope of the coverage.

59.     In reliance upon CAT's representations, Venequip paid more than $16 million in insurance premiums from 2005 to 2017.

60. Eventually, due to Venezuelan government action, *i.e.*, PDVSA's refusal to pay Venequip, the ability of Venequip's affiliates to repay CAT became impaired.[4]

61. Venequip demanded that CAT seek coverage under the political risk insurance policies. Venequip would eventually learn to its surprise that the insurers refused to provide coverage, arguing that the policies did not broadly cover all adverse government actions such as the PDVSA financial default but rather were narrowly tailored to extreme situations such as riots and physical expropriations of property by the Venezuelan government. This contradicted the affirmative representations that CAT had made to Venequip for nearly a decade regarding the broad scope of the political risk insurance policies that CAT required Venequip to purchase.

vi. <u>CAT Approves of Long-Term Planning with Venequip, Including Succession Planning</u>

62. Until 2009, the leader of the Venequip business was Carlos Bellosta Sr. In or about 2010, he began to transition the business to his son, Carlos Jose Bellosta ("Carlos Jose").

63. The 2004 agreements required Venequip to have a designated "Dealer Principal" to act as the main point of contact in the relationship and to be primarily responsible for the CAT business. CAT had to approve any changes to the Dealer Principal. Therefore, the succession plan to have Carlos Jose run the business of Venequip required CAT's approval.

64. In or around 2012, Carlos Jose and his father informed CAT that they wanted Carlos Jose to formally replace his father as the Dealer Principal for Venequip. At first, CAT refused to allow this, as they had been working with Carlos Bellosta Sr. for many years and had less experience with Carlos Jose. In 2014, after extensive discussions, CAT agreed to this formal transition and to Carlos Jose becoming Co-Dealer Principal. CAT, however, demanded that Carlos

---

[4] PDVSA is owned and controlled by the Venezuelan government and several U.S. courts have deemed PDVSA to be an alter ego of Venezuela.

Bellosta Sr. remain as Co-Dealer Principal for a period of time for appearances' sake because CAT understood that Venequip's customers and CAT's end users knew and trusted Carlos Bellosta Sr. in light of the long duration of his service on behalf of CAT.

65.     CAT and Venequip formalized Carlos Jose's Co-Dealer Principal role at a March 31, 2015 meeting. CAT's consent to this transition included approval of a five-year plan, which further establishes that: (a) Venequip and CAT were looking beyond 2019; and (b) both intended to continue working together for many more years.

      vii.    2015 Agreements Further Establish the Long-Term Relationship

66.     In 2015, continuing to reaffirm their commitment to work together, CAT SARL and Venequip signed a new set of dealer agreements superseding the 2004 agreements. Again, CAT used its Swiss offshore entity to sign the contracts. Therefore, CAT (the defendant entity in this action) is not a party to the 2015 agreements. In fact, CAT has represented that the 2015 agreements are not binding upon CAT, and that CAT is separate from its Swiss offshore entity.

67.     The 2015 agreements are essentially identical to the 2004 agreements. The main purpose of the 2015 agreements was to reflect Carlos Jose's new role as Venequip's leader and to amend the pricing of the equipment and parts that CAT sold to Venequip.

      viii.    CAT and Venequip's Relationship Took Place in Venezuela

68.     CAT and Venequip's relationship was centered in Venezuela. For a period of time, CAT's executive responsible for the relationship with Venequip lived in Venezuela and had an office at a Venequip location in Venezuela. CAT's executives and other personnel routinely travelled to Venezuela to advance and strengthen the CAT-Venequip relationship, including to: (a) meet and confer with Venequip's team in Venezuela; (b) visit and certify Venequip's service shops in Venezuela; and (c) meet with Venequip's Venezuelan customers and potential customers

in Venezuela. CAT routinely corresponded with and participated in telephone and video conferences with Venequip's team in Venezuela.

69.     Further, the machinery, engines and parts that CAT sold to Venequip were sold by Venequip primarily in Venezuela and/or to Venezuelan customers.

70.     And of course, the effects of the relationship—the revenue, profits and eventually the substantial damages caused by CAT's misconduct—were all felt, acutely, in Venezuela.

### C.     CAT's Extra-Contractual Course of Dealing and Affirmative Representations to Venequip

71.     As discussed above, CAT was not a party to, did not sign, and has represented that it was not bound by the 2004 and 2015 agreements. In fact, according to CAT, these agreements were narrow in scope. According to CAT's affirmative representations to Venequip, these agreements primarily designed to delineate Venequip's obligations in Venezuela – *i.e.*, not CAT's obligations to Venequip.

72.     CAT's obligations to Venequip were not delineated in any written contract but rather were set forth through CAT's extensive course of dealing with and CAT's affirmative representations to Venequip.

73.     Through its course of dealing with Venequip as well as through its affirmative verbal and written representations, CAT created, encouraged, and nurtured a relationship with Venequip beyond and outside the written agreements with CAT SARL. Indeed, Venequip rarely (if ever) interacted with CAT SARL employees other than for invoicing and other administrative matters. In fact, CAT recorded sales to Venequip as commercial debt owed to CAT (not CAT SARL), which further shows that CAT had and recognized it had a direct commercial relationship with Venequip.

74.     CAT knowingly and intentionally represented to Venequip that CAT and Venequip had a genuine partnership in developing the Venezuelan market on a long-term basis and in growing CAT's business through Venequip in Venezuela, including with key Venezuelan customers such as PDVSA. Beyond anything that was written in the CAT SARL agreements, CAT affirmatively represented to Venequip that: (a) Venequip was and would continue to act as CAT's only authorized dealer in Venezuela; and (b) CAT would not act to undermine Venequip's ability to sell CAT's products in Venezuela. As to (b), CAT represented to Venequip that: (i) CAT was offering and would continue to offer Venequip pricing comparable to that offered to CAT's other dealers; (ii) CAT would not facilitate sales by other dealers into Venezuela; and (iii) CAT would not allow resellers to sell into Venezuela.

75.     Venequip reasonably relied upon CAT's material representations on this score. Thus, Venequip reasonably relied upon the fact that CAT would not engage in disloyal, misleading and fraudulent practices. CAT knew and intended that Venequip would rely on these representations and on the fact that Venequip would rely upon CAT's good faith in the parties' dealings.

76.     As discussed below, CAT's material representations were false and misleading. CAT was playing Venequip. Using unfair trade practices, in addition to making outright misrepresentations, CAT allowed dealers and resellers to eviscerate Venequip's business in Venezuela, including appropriating and attempting to appropriate key customers such as PDVSA.

       i.     CAT Representation: Sole Authorized Dealer

77.     CAT repeatedly represented to Venequip through written and oral communications and through its actions and policies that Venequip was and would continue to act as CAT's only authorized dealer of equipment and parts in Venezuela. Knowing and intending that Venequip

would rely upon its representations, at all times CAT assured Venequip through written and oral communications and through its actions and policies that: (a) sales into Venezuela by other dealers were exceptional; and (b) CAT was not facilitating, nor would it facilitate, invading sales into Venequip's territory.

78.     Venequip relied upon CAT's representations on this score.

79.     CAT provided numerous letters to Venequip throughout the years affirmatively stating that Venequip was the only authorized dealer of CAT in Venezuela. Venequip requested these letters from CAT because certain Venequip customers, including PDVSA, required them to confirm that Venequip was the only authorized dealer in Venezuela. CAT issued those letters to Venequip knowing and intending that Venequip and its customers would rely upon CAT's representations because CAT knew that Venequip required the letters to demonstrate to its customers its status as the only authorized dealer of CAT equipment in Venezuela.

80.     Venequip and its customers in fact, and reasonably, relied upon CAT's representations, which induced Venequip and these customers to do business with CAT in Venezuela. Indeed, Venequip's most important customers such as PDVSA stated to Venequip that such letters served to confirm Venequip's status as the only authorized dealer of CAT equipment in Venezuela.

81.     Moreover, CAT induced Venequip into believing that CAT would not facilitate sales by others, including other dealers, into Venezuela—and certainly not without Venequip's knowledge and consent. For example, CAT maintained a so-called "Diversion List" designed by CAT to control and facilitate dealer-to-dealer sales. Dealers inputted into the Diversion List each item of CAT equipment in its inventory that they did not need or wanted to sell to other dealers. If another dealer was interested in any item of equipment on the Diversion List, CAT facilitated the

sale by: (a) paying the selling dealer for that item of equipment; and then (b) having the purchasing dealer pay CAT. CAT did not disclose to the selling dealer the price that the purchasing dealer paid to CAT.

82.     By maintaining this Diversion List through which dealers would sell to each other, CAT: (a) hindered dealers from selling directly to each other, and, more importantly, from discovering the extent to which CAT gave dealers disparate pricing; and (b) induced Venequip into believing that Venequip could not sell into other dealers' territories unless CAT facilitated the process.

83.     Moreover, CAT knowingly and intentionally caused Venequip to believe that invading (*i.e.*, selling into) other dealers' territories was prohibited. CAT affirmatively and repeatedly told Venequip that Venequip and its affiliates could not sell CAT equipment and parts in the United States. In so doing, CAT caused Venequip to believe that: (a) in turn, CAT's dealers in the United States and elsewhere likewise were prohibited from selling equipment and parts in Venezuela; and (b) CAT certainly would not facilitate and/or permit such invading sales in Venezuela.

84.     CAT took other affirmative steps to induce Venequip into believing that Venequip was the only authorized dealer in Venezuela and that CAT would intervene to stop and/or discourage other dealers from selling CAT equipment in Venezuela. For example, in or about February 2015, a Colombian company responsible for a large construction project in Aruba asked CAT where it could source the necessary equipment. CAT intervened in favor of Venequip's affiliates, which as discussed above were responsible for distribution of CAT equipment in Aruba, Bonaire and Curaçao, thereby dissuading the Colombian company from purchasing CAT equipment from any other dealer. This is just one of many examples of CAT inducing Venequip

-20-

to believe that, within Venequip's territories, it was the only party authorized to sell CAT equipment and that CAT would not facilitate invading sales in Venequip's territories.

85.     As further discussed below, Venequip eventually discovered that CAT lied. In fact, behind Venequip's back, CAT had knowingly supported, and/or facilitated invading sales in Venezuela by out-of-country dealers.

ii.     <u>CAT Representation: Uniform or Close to Uniform Pricing</u>

86.     CAT repeatedly represented to Venequip that CAT sold the same equipment that Venequip purchased from CAT at similar prices to CAT's other dealers. In essence, CAT represented to Venequip that there was a uniform playing field across all dealers such that no dealers received preferential treatment over others, and that CAT would certainly not discriminate against any of its dealers. Thus, CAT represented that it would not: (a) undermine Venequip's ability to sell in Venezuela; and/or (b) facilitate the ability of other dealers to sell in Venezuela.

87.     CAT's written statements and affirmative actions confirmed its verbal representations. For example, when Venequip occasionally would learn of CAT equipment in Venezuela that it had to service but that it had not sold, Venequip would inquire with CAT regarding the sale. Sales by third parties in Venezuela made little economic sense given, *inter alia,* that: (a) Venequip had been CAT's dealer for almost a century and had a close relationship with every significant company in the country that would require the type of equipment CAT sold (*e.g.*, heavy machinery, engines, or parts); and (b) to sell in Venezuela, foreign dealers necessarily would have higher costs given the added shipping costs. The only way in which other dealers could profitably sell into Venezuela was if they were purchasing equipment from CAT at significant discounts, thereby allowing them to sell into Venezuela at materially lower prices than Venequip.

88. In response to Venequip's concerns, CAT represented to Venequip that it sold to all dealers at similar prices and that it was impossible for other dealers to be selling into Venezuela at significantly lower prices. In light of its relationship of trust and confidence with CAT, Venequip relied upon CAT's representations and thus was lulled into refraining from taking further actions or making further inquiries to address its concerns about invading sales in its territory.

89. For example, in 2015, one of PDVSA's subsidiaries expressed an interest in purchasing from Venequip several millions of dollars of CAT equipment. PDVSA ultimately did not purchase all the equipment from Venequip because Mustang, a company that acts as CAT's dealer in Texas, was offering the PDVSA affiliate significantly lower prices for the same equipment. Venequip complained to CAT. It was ludicrous that a U.S. dealer could compete with Venequip in Venezuela by offering CAT equipment to one of Venequip's most important customers in Venezuela at significantly lower prices than Venequip, CAT's sole and only authorized Venezuelan dealer.

90. CAT's executive responsible for Venezuela agreed, describing the Mustang situation as "incredible." However, intending and knowing that Venequip would rely upon its representation, CAT assured Venequip that it was not selling at lower prices to Mustang and that Mustang likely was taking a loss on the sale to PDVSA. In light of their long-standing relationship of trust and confidence, Venequip relied upon CAT's assurance. Simply put, Venequip trusted that its partner in Venezuela—CAT—would not lie to Venequip or undermine their long-standing partnership by facilitating invading sales in Venezuela.

91. Later, when Venequip sought to obtain discovery from CAT and Mustang under 28 USC § 1782 about this (and other) sales, CAT and Mustang (with CAT's support) vigorously (and

successfully) opposed Venequip's effort to do so. Clearly, CAT wanted to hide the truth about its discriminatory pricing (in Mustang's favor) from Venequip.

92.    As further discussed below, Venequip eventually discovered that CAT lied. CAT often sold at significantly lower prices to other dealers, as much as 20% to 40%, and knew that those dealers would later invade Venequip's territory by selling that equipment in Venezuela at significantly lower prices than the prices CAT made available to Venequip, thereby depriving Venequip of an unknown number of sales of CAT engines and machines, diminishing its market share in its own territory, and causing it substantial damage.

      iii.    CAT Representation: Resellers Not Allowed

93.    CAT repeatedly represented to Venequip that CAT and its dealers were prohibited from selling equipment or parts to resellers. Resellers are entities that purchase and resell CAT equipment without having a dealership agreement. It made sense to Venequip that sales to resellers were forbidden since a reseller adds no value to the sale and service of CAT equipment—resellers are mere conduits that do not know the brand, do not have long-term relationships with customers, and have no installed capacity in a territory to service the equipment that they sell.

94.    Further, the sale to resellers represents a substantial compliance risk for CAT, as resellers can be sham companies lacking the compliance infrastructure that dealers have in place. Therefore, in allowing resellers to sell equipment in Venezuela, CAT willingly assumed the risk that those resellers might be paying bribes or engaging in other violations of U.S. law in the sale of CAT equipment on behalf of CAT.

95.    When Venequip would find a machine or engine in Venezuela that it had not sold, it would inform CAT. If CAT was able to identify that a reseller had made the sale, CAT would

inform Venequip that it supposedly had added that party to its "resellers list," which CAT represented was a list of barred entities to which neither CAT nor its dealers could sell.

96.     In light of its trust and confidence in CAT and their long-standing relationship, Venequip believed CAT and thus refrained from taking further action to address the reseller issue.

97.     As further discussed below, Venequip eventually discovered that CAT lied. It had extensively encouraged, supported and facilitated sales to resellers, knowing those entities would sell into Venezuela.

      iv.     <u>CAT Representation: Commitment to Joint Development of Venezuelan Customers</u>

98.     Reflecting their partnership, CAT and Venequip frequently met to discuss joint strategies and initiatives regarding key customers, particularly customers likely to make large purchases of CAT equipment. In Venezuela, especially after the wave of nationalizations in the early 2000s, one of the largest customers of heavy machinery and engines was the Venezuelan government, in particular, as noted, PDVSA, the national oil and gas company.

99.     CAT recognized and benefitted from Venequip's strong relationships with Venequip customers, including government customers. For example, in an August 2015 communication, CAT recognized that "Venequip has also solidified its strong position with the government by maintaining direct access to key government officials even as they turn-over frequently."

100.     CAT and Venequip corresponded, met, and discussed strategies to increase the business with PDVSA on numerous occasions. Their joint work regarding PDVSA was memorialized, *inter alia*, in a joint report issued in 2014 following a three-day long meeting between CAT and Venequip executives and other jointly-generated materials such as the Growth Plan (addressed below) and Venequip Dealer Profiles.

101.    In particular, the 2014 joint report was a "living document" that was periodically updated. In this report, CAT acknowledged that Venequip and CAT were inextricably intertwined in Venezuela. The report stated that Venequip was perceived as being owned by CAT, as CAT's "strategic partner," and as "***the***" supplier of CAT's equipment in Venezuela:

  a.  "Perception is Cat is owner of Venequip."

  b.  "Caterpillar and Venequip regarded by PDVSA as trusted strategic partner in oil / gas, marine, constructions and mining operations."

  c.  "Venequip – Cat partnership."

  d.  "The client identifies and recognizes Venequip as ***the*** Caterpillar supplier (both in Venezuela and abroad)." [Emphasis added.]

102.    CAT benefited substantially by its association with Venequip, as Venequip enjoyed a reputation in Venezuela as professional, technically competent, and reliable. And CAT readily recognized that its association with Venequip (and the perception that the two companies enjoyed a strategic partnership) served to bolster the CAT brand in Venezuela.

103.    With CAT's knowledge and approval, the 2014 joint report emphasized that resellers and other third parties seeking to sell CAT equipment into Venezuela were not serious competitors of Venequip due to the lack of "support" and "coverage" for them. Thus, CAT reassured Venequip that it did not need to worry about competition from resellers and other third parties in Venezuela.

104.    The report laid out a detailed analysis of PDVSA, its businesses, and the areas where Venequip could increase its sales. The joint report extensively described how CAT would support Venequip, including as to pricing, to ensure that Venequip could increase its sales to PDVSA.

105.    Similarly, in July 2014, at least one senior CAT executive, together with Venequip employees, held a meeting in Venezuela with PDVSA regarding CAT equipment being used by PDVSA. Indeed, CAT executives met with Venequip's team in Venezuela or held video or telephone conferences with Venequip's team in Venezuela to design and implement additional marketing and business development strategies, including strategies as to specific customers.

106.    In or about May 2015, CAT and Venequip jointly-generated an Oil & Gas Growth Plan ("Growth Plan") explicitly designed to set forth the parties' intent regarding business growth in Venezuela through December 2018. Per the Growth Plan, "[t]his aligned growth plan outlined the critical success factors and the key actions that must be achieved by each Venequip, Cat Oil & Gas, and Caterpillar DSD teams in order to ensure our mutual success along with PdVSA and the very nation of Venezuela." The Growth Plan explicitly recognized that the "key Customer for Oil & Gas in Venezuela is PDVSA."

107.    The Growth Plan projected long-term needs that CAT and Venequip planned to satisfy together: "Thousands of Cat engines and gensets are in need of service, maintenance, and/or replacement. These critical needs are stranded by the severe cash flow and credit problems of the country. Caterpillar, together with Venequip, are the strongest player in the market and have a unique opportunity to face this challenge, connect the financial dots, and simultaneously help an entire country recover financially while reaping an enormous harvest in sales and service."

108.    Through its course of dealing and representations, CAT led Venequip to believe that it intended to work with Venequip to continue developing the Venezuelan market and successfully expand Venequip's business as the only authorized dealer of CAT equipment and parts in Venezuela.

109.     As further discussed below, Venequip eventually discovered that CAT lied. CAT took minimal or no steps to support Venequip's sales to PDVSA and instead facilitated invading sales by other dealers and resellers to PDVSA that served to substantially undercut Venequip's sales to PDVSA and to other Venezuelan-owned entities through disloyal, misleading and fraudulent practices.

**D.     CAT Praises Venequip**

110.     CAT further induced Venequip into believing that it had a genuine partnership—with Venequip acting as the only authorized partner for CAT in Venezuela—through CAT's persistent and effusive praise of Venequip and its principals. Throughout the years, CAT sent letters and emails or made representations at meetings praising Venequip, its staff, and its business operations. Just a few examples of the foregoing are described below.

111.     For example, on August 14, 2000, Paul Knollmaier, who at the time lived in Venezuela, worked from Venequip's offices and was CAT's executive responsible for managing the relationship with Venequip, sent an email to Carlos Bellosta Sr. stating that: "I have much to thank you for, not the least of which are your trust, your friendship and the chance to learn of business that I would never have learned from anyone else." Mr. Knollmaier also stated that Carlos Bellosta Sr. was "a brilliant man and immensely capable."

112.     On February 27, 2005, Dale Haning, who succeeded Mr. Knollmaier, sent a letter to Carlos Bellosta Sr., stating that: "it was my privilege working with you and your terrific team [...] We can all look back with pride that we worked together."

113.     On March 31, 2015, Jessica Poliner, who as of 2015 was CAT's executive responsible for managing the relationship with Venequip, sent a letter to Carlos Bellosta Sr. stating that she "greatly valued our relationship and your trust in my guidance." Ms. Poliner also stated

that "what you have done with this company, as reflected in your brief history, is incredible." As to Carlos Bellosta Sr., specifically, she stated that he was a "leader of great heart, who has placed CAT and its partners before himself in every case."

114.    CAT emphasized its commitment to Venequip and to actively engaging with Venequip, including through continued visits to Venezuela. For example, in August 2015, a CAT executive represented to CAT colleagues and Venequip: "Venequip has professionally and skillfully maneuvered the deteriorating political and economic conditions to position Cat well in the future. As such, Cat industries remain actively engaged and visiting Venezuela despite its challenges."

115.    On April 9, 2016, after a visit by several CAT executives to Venequip's offices and service shops in Venezuela, the entire CAT team sent emails praising Venequip. CAT was "impressed with the quality of the installations and investments that Venequip continues making despite everything and with great admiration for the staff of Venequip." Another CAT executive stated that CAT was impressed "not only for what Venequip has accomplished in these difficult times but also compared to the rest of the big companies many of which are no longer operating." Importantly, CAT affirmatively represented that Venequip should rely on CAT "for any support" that Venequip required.

### E.    Venequip Learns of CAT's Lies and its Active Facilitation of Invading Sales in Venequip's Territory

### i.    CAT Knowingly Facilitates the Unfair Invasion of the Venezuelan Market

116.    ***Venequip Discovers That CAT is Offering Far Better Pricing to Other Dealers***. During the second half of 2018, Venequip became aware that CAT may have been lying to it all along, knowingly and intentionally facilitating the ability of these other dealers and/or resellers to unfairly invade the Venezuelan market.

117.     Venequip discovered the foregoing in connection with its effort to sell CAT equipment resulting from an order that a Venezuelan customer cancelled. In 2015, Venequip entered into a contract with a Venezuelan entity for the sale of several pieces of CAT equipment. By 2017, the company had failed to pay the full purchase price and Venequip kept the unpaid equipment as inventory. Because the equipment was unused and had retained its full value (or very close to it), Venequip attempted to sell it. The equipment was comprised of one 992K machine, which was a large wheel loader, and three 988K machines, another type of large wheel loader.

118.     In or around August 2018, Venequip was able to sell one of the 988K machines to Finning, CAT's dealer in Argentina and other countries. Finning, however, refused to pay the price that Venequip was asking, noting that Finning could purchase similar machines from CAT at significantly lower prices. Finning ended up paying Venequip approximately 23% less than what Venequip had paid CAT for the machine (Venequip had paid $769,780.36 and sold it to Finning for $594,736.07).

119.     In November 2018, Venequip sold the 992K machine to Westrac, CAT's dealer in Australia. Like Finning, Westrac refused to pay Venequip the price that Venequip had paid CAT for the machine, arguing that Westrac purchased similar machines from CAT at significantly lower prices. Westrac ended up paying Venequip approximately 32% less than what Venequip had paid CAT for the same machine (Venequip had paid $1,764,620.54 and sold it to Westrac for $1,200,000).

120.     In December 2018, Venequip sold the two remaining 988K machines to Westrac. Westrac paid approximately 38% less than what Venequip had paid CAT for the machines (Venequip had paid $1,539,060.72 and sold them to Westrac for $950,000).

121.    The sales to Finning and Westrac revealed to Venequip that CAT was selling the same equipment to other dealers at materially lower prices, which was contrary to the representations that CAT had been making to Venequip for years.

122.    In or about October 2018, Venequip confronted CAT about this massive pricing disparity that undermined Venequip's ability to conduct business in its own territory. Joe Andris, a then senior CAT finance executive, admitted for the first time that CAT in fact often would sell at deeply discounted prices to other dealers but that CAT saw no need to give Venequip any discounts because Venequip was a market leader and had a strong presence in Venezuela. In so doing, Mr. Andris confirmed to Venequip that CAT had been lying to Venequip for years, that is, falsely representing to Venequip that its pricing was comparable to CAT's pricing to other dealers.

123.    Nor did Mr. Andris's explanation make sense. So long as CAT permitted dealers outside of Venezuela to sell into Venezuela at substantially reduced prices, then the notion that Venequip had a strong presence in its "market" was of little utility because the material disparity in pricing effectively negated Venequip's competitive advantage of being present in and the only authorized dealer in the country. And rather than having different markets defined by region, CAT's undisclosed disparate pricing scheme effectively created a single, global market where the dealer who obtained the lowest price from CAT derived an unfair material advantage over other dealers.

124.    The sale to other dealers at discounted prices explained why Venequip had seen CAT equipment and parts in Venezuela that had been sold by others.

125.    ***CAT Knew that Other Dealers were Selling into Venezuela***. CAT knew that the dealers to which it was selling at a discount were then selling into Venezuela. CAT maintains a detailed database with the full timeline of each machine and engine that it sells. That database

shows the location of each machine and engine, the selling dealer, all services, and repairs that have been performed on the piece of equipment, and the dealer responsible for any such services and repairs. Dealers of CAT equipment ensure that all this information is in CAT's database because otherwise they risk voiding their warranties. Therefore, CAT knows with precise detail what equipment has ended up in Venezuela, who sold it, and who has been servicing it.

126.    As such and despite its repeated representations to the contrary to Venequip, CAT knowingly and intentionally facilitated invading sales by other dealers into the Venezuelan market. CAT unfairly sold to other dealers at steep discounts and at far lower prices than the prices charged to Venequip for the same equipment.

127.    CAT, in turn, knew that these other dealers were using their substantial discounts to undercut Venequip and sell into Venezuela to Venequip's customers, thereby unfairly causing Venequip to lose market share and the value of the substantial investment it made to position the CAT brand in the country for which it has served as CAT's only authorized dealer.

128.    ***CAT Brazenly Discusses Venezuelan Sales with Other Dealers***. Venequip's concerns resulting from the sales of these machines and Mr. Andris' admissions, were compounded by statements made by a senior CAT executive in December 2018 during an annual meeting between CAT and its Latin American dealers.

129.    Importantly, a substantial portion of this presentation focused on explaining to the Latin American dealers the risks of conducting business in Venezuela. If CAT had concerns about issues unique to doing business in Venezuela, it needed only to discuss them with its only authorized Venezuelan dealer—Venequip. It would have made no sense to deliver such a presentation to all regional dealers unless CAT knew that those dealers were invading the Venezuelan market by selling directly into Venezuela or were selling to resellers who would then

sell into Venezuela. It thus became obvious to Venequip because of this presentation that CAT was fully aware of invading sales into Venezuela by other dealers or resellers and that it was no longer hiding that fact.

130.    CAT's discriminatory pricing scheme served as a double whammy for Venequip. CAT's discriminatory pricing scheme not only caused Venequip substantial harm by permitting out-of-country dealers to invade Venequip's territory, but the discriminatory pricing scheme also caused it substantial harm because Venequip was handcuffed and unable to compete in out-of-country markets so could not reciprocate in kind. First, CAT instructed Venequip not to sell into the United States. Second, the substantially higher prices charged to Venequip left Venequip noncompetitive, especially since Venequip would also have to pass on the shipping costs to the end users.

ii.    Further Investigation Reveals More Disloyal, Misleading and Fraudulent Practices

131.    After 2018, Venequip made further inquiries, confirming that CAT engaged in disloyal, misleading and fraudulent practices by, *inter alia*, misrepresenting to Venequip that: (a) Venequip was CAT's only authorized dealer in Venezuela; (b) CAT was committed to Venequip's success as Venequip's partner in Venezuela; and (c) CAT would not undermine Venequip's business—*e.g.*, that (i) the pricing for other dealers was the same (or close to it) as its pricing for Venequip, and (ii) CAT prohibited the use of resellers.

132.    Venequip was able to determine that there are at least 3,201 CAT machines and engines in Venezuela that Venequip did not sell. The value of these items could exceed hundreds of millions of dollars. The level of invasion in Venezuela by other dealers and/or resellers is massive. Given that CAT can track all such sales, it knew and had reason to know that these dealers and/or resellers were invading the Venezuelan market but did nothing to stop it—and in fact

facilitated such invading sales by the grant of deep discounts and greenlighting the sale through unauthorized conduits/resellers, while at the same time representing to Venequip that it was not facilitating such sales.

133.    Upon information and belief, there are many more CAT items (beyond the 3,201) in Venezuela that Venequip did not sell. Venequip would often receive requests from Venezuelan customers for quotes for CAT equipment and parts. In many cases, Venequip did not hear back from these customers after providing the quote. Upon information and belief, other dealers and/or resellers supplied the CAT equipment and parts to those customers. Given their long-standing relationship of trust and confidence and CAT's repeated representations as described above, Venequip trusted that CAT was not behind and/or a facilitator of these invading sales.

134.    CAT's disloyal, misleading and fraudulent practices and conduct to undermine Venequip extended to Venequip's most important customer: PDVSA. Venequip discovered that CAT knew of and facilitated numerous invading sales of equipment and parts to PDVSA through resellers located in the United States or elsewhere, including a U.S. company called Tradequip Services & Marine Inc. ("Tradequip").

135.    In December 2015, the U.S. government charged Tradequip's principals for using Tradequip as a conduit to pay bribes and make sales to PDVSA. Upon information and belief, (a) Tradequip was a reseller of CAT equipment and parts, and (b) CAT knew and had reason to know that Tradequip was a reseller of its equipment and parts in Venezuela. CAT knew or should have known about Tradequip's sales of CAT equipment or parts to PDVSA because, *inter alia*, CAT knows in detail about the location of each machine and engine, the seller and the parties providing services to that item, including providing repair or parts.

-33-

136.    By allowing sales via resellers to PDVSA, CAT knowingly and intentionally aided invading dealers and resellers in reaching Venequip's most important customers in the Venezuelan market. Contrary to CAT's representations during the numerous meetings and conversations regarding PDVSA and contrary to the plans laid out in joint written reports and other writings, CAT did not work with Venequip to obtain more business from PDVSA. Instead, CAT facilitated invading sales in Venezuela by selling to resellers (through other dealers) knowing and intending that those resellers, in turn, would sell to PDVSA. Venequip was unable to grow its business with PDVSA because resellers aided by CAT were taking over the customer, including through corrupt means.

### F.    CAT Retaliates Against Venequip

137.    In January 2019, because of the issues that it had discovered during 2018 and the statements by CAT executives during the December 2018 presentation to Latin American dealers, Venequip's outside counsel delivered a letter to CAT requesting explanations for CAT's conduct, including knowing sales at disparate pricing to invading dealers and resellers.

138.    CAT provided no meaningful response.

139.    However, CAT did retaliate against Venequip. Just two months later, in March 2019, CAT caused a series of letters to be sent to the Venequip entities purporting to provide notices of termination under the different written agreements between CAT SARL and the Venequip entities. Notably, the letters did not provide any reason at all for the decision to terminate the agreements.[5] The agreements purported to provide three months' notice of termination. In June, additional letters were sent purporting to confirm the termination.

---

[5] We anticipate that in this action CAT may attempt to generate after-the-fact justifications for the decision to terminate the 2015 agreements. For example, CAT may argue that the termination was related to a DOJ criminal investigation against two former Venequip employees for paying bribes to cause PDVSA to pay some of the monies it owed Venequip. Upon learning of the charges,

140.     CAT's decision to seek termination of the relationship with Venequip was in retaliation to Venequip's questions (and potential litigation) regarding CAT's disloyal, misleading and fraudulent practices and mistreatment of Venequip.

141.     Thereafter, CAT further retaliated against Venequip and undermined its ability to conduct business in Venezuela. CAT prohibited its dealers from doing any business with Venequip and its affiliates. As a result, Venequip was unable to sell to other CAT dealers any of the inventory of CAT equipment and parts that Venequip held at the time it received the letters of termination, and it has simultaneously been unable to purchase CAT parts to service existing customers of CAT equipment in Venezuela. This harmed Venequip as well as customers in the Venezuelan market who were forced to seek service from less experienced and less capable repair and service providers – either at higher prices or for lower quality.

**G.     CAT's Efforts to Prevent Venequip from Discovering the Truth**

142.     On top of the fact that CAT lied to Venequip, CAT engaged in a concerted effort to prevent Venequip from discovering its lies and the extent of CAT's invading sales in Venezuela through third parties.

143.     Initially, during letters exchanged by the parties in 2019 prior to the delivery of the notices of termination, Venequip asked CAT to simply agree to provide information about the sale of CAT equipment and parts in Venezuela. CAT completely refused to provide the information.

144.     Thereafter, Venequip engaged in efforts in the United States under 28 USC § 1782 to obtain discovery from CAT and U.S.-based third-parties, such as dealers, about sales of CAT

---

Venequip fired these individuals and has since sued them for their misconduct. The fact is that CAT never raised any questions or concerns with Venequip's compliance protocols and procedures, never raised the issue of these former employees as a reason for termination, and no U.S. agency ever took action against Venequip for the conduct of these former employees.

equipment and parts in Venezuela. Venequip filed these discovery applications seeking evidence for use in a breach of contract action that Venequip sought to pursue against CAT SARL in Switzerland under the 2015 distribution agreement. Specifically, Venequip commenced a pre-litigation mediation proceeding against CAT SARL (which is mandatory under Swiss law) though it has not yet filed a lawsuit there.

145.    CAT vigorously opposed Venequip's discovery efforts. It successfully blocked Venequip from discovering this information from CAT, took the position that it was not a party to or bound by these agreements and therefore not subject to the jurisdiction of Swiss courts, and aided and abetted third parties—including dealers—in their efforts to hinder Venequip's discovery efforts.

### H.    CAT Decimated Venequip's Business

146.    As a result of CAT's misconduct, CAT destroyed Venequip's business as it then existed. CAT unfairly and misleadingly allowed other dealers and resellers to invade Venequip's territory. This deprived Venequip of hundreds of millions of dollars in revenue that would have been generated from the sale of equipment and parts. For example, just in 2015, Venequip received requests for, and provided quotes to clients for, the sale of approximately $400 million in CAT equipment and parts. However, Venequip could complete sales for only approximately $45 million. This means that many hundreds of millions of dollars of sales in Venezuela were being pocketed by invading dealers and resellers, all aided by CAT.

147.    In addition, the sale of CAT equipment implied an income to Venequip—that Venequip lost due to CAT's misconduct—for the maintenance and repair services that inevitably flowed during the useful life of the sold equipment. When a CAT machine or engine was sold in Venezuela by someone other than Venequip, the service of the machine or engine often would be

performed by the person or entity responsible for the sale or by some local shop. Only in a minority of instances would the end user go to Venequip for servicing of CAT product sold by a party other than Venequip. Additionally, this harmed Venezuelan consumers by forcing them to turn to shops with far less experience and training in repairing and servicing CAT equipment and parts.

148.    The entry of CAT equipment and spare parts into Venezuela not distributed by Venequip also harmed Venequip's brand and reputation, as Venequip and CAT together had long-promoted the CAT-Venequip brand and various workshops in support of the brand. By allowing others to sell in Venezuela, CAT undermined this joint branding and assurance to purchasers that they were being backed and serviced by the long-standing CAT-Venequip partnership.

149.    CAT's prohibition to dealers to conduct any business with Venequip has further eviscerated Venequip's business as well as harmed Venezuelan consumers, rendering Venequip unable to provide any meaningful services to the large network of customers of CAT equipment in Venezuela.

**V.       Venezuelan Law**

150.    Venequip brings this complaint against CAT under Venezuelan law. Venezuelan law applies because, *inter alia*: (a) Venequip is in Venezuela; (b) Venequip's business activities regarding CAT were conducted from Venezuela and focused on the Venezuelan market; (c) Venequip suffered its injury in Venezuela; (d) CAT knew and expected that its actions would be felt by Venequip in Venezuela; (e) CAT advanced its relationship with Venequip while in Venezuela, engaged in misconduct in Venezuela, and directed its actions, representations, and omissions to Venequip in Venezuela; and (f) Venequip received CAT's misrepresentations and acted in reliance thereon in Venezuela.

151.    The relationship between Venequip and CAT is not governed by any written contract. Indeed, the claims alleged herein are independent from and stand outside of any contractual relationships. Venequip's claims against CAT arise from CAT's course of dealing, their long-standing relationship of trust and confidence, and written and verbal representations and assurances to Venequip regarding Venequip's business, all of which are subject to Venezuelan law.

### COUNT I: Violation of Article 1185 of the Venezuelan Civil Code

152.    Venequip incorporates herein paragraphs 1 to 151.

153.    Article 1185 of the Venezuelan Civil Code states that anyone who intentionally or negligently causes an injury must pay damages.[6]

154.    Here, CAT has intentionally and/or negligently injured Venequip and must pay damages. As alleged above, CAT's intentional and/or negligent conduct includes without limitation: (a) encouraging, allowing or facilitating sales by dealers into Venezuela despite repeatedly representing to and assuring Venequip that Venequip was the only authorized distributor in Venezuela and that CAT would not encourage, allow or facilitate sales by other dealers into Venezuela; (b) selling to dealers at significantly lower prices than Venequip, knowing that those dealers were planning to and did indeed sell into Venezuela; (c) encouraging, allowing

---

[6] Artículo 1185. El que, con intención, o por negligencia o por imprudencia, ha causado un daño a otro, está obligado a repararlo. Debe igualmente reparación quien haya causado un daño a otro, excediendo, en el ejercicio de su derecho, los límites fijados por la buena fe o por el objeto en vista del cual le ha sido conferido ese derecho.

[English Translation]

Article 1185. Whoever intentionally, or through negligence or recklessness, has caused damage to another, is obliged to repair it. Whoever has caused harm to another, exceeding, in the exercise of his right, the limits established by good faith or by the objective for which that right has been conferred, also owes reparation.

or facilitating sales by resellers into Venezuela despite repeatedly representing to and assuring Venequip that CAT prohibited and would not facilitate sales by resellers; (d) encouraging, allowing or facilitating sales by other dealers and/or resellers to key Venezuelan clients such as PDVSA despite repeatedly representing to and assuring Venequip that CAT would aid Venequip in growing sales to such key customers and would not aid other dealers or resellers in invading the Venezuelan market; (e) prohibiting other dealers from conducting any business with Venequip in retaliation for Venequip inquiring with CAT about CAT's misconduct; and (f) violating Article 16 of Venezuela's Antitrust Law, as described below.

155.    CAT's intentional and/or negligent misconduct, including violations of Venezuela's Antitrust Law, destroyed Venequip's business. CAT allowed other dealers and resellers to invade Venequip's territory. This deprived Venequip of hundreds of millions in revenue that would have been generated from the sale of equipment and parts.

156.    CAT's prohibition to dealers to conduct any business with Venequip has further eviscerated Venequip's business, rendering Venequip unable to provide any meaningful services to the large network of users of CAT equipment in Venezuela.

**WHEREFORE**, Venequip respectfully requests a final judgment against CAT, awarding damages in an amount to be determined at trial but not less than $100 million, plus pre-judgment and post-judgment interest, and any such other or additional relief deemed just and proper.

**COUNT II: Violation of Article 1184 of the Venezuelan Civil Code**
**(Alternative to Counts I and III)**

157.    Venequip incorporates herein paragraphs 1 to 151.

158.    Article 1184 of the Venezuelan Civil Code states that any party who profits to the detriment of another must disgorge such profits.[7]

159.    As alleged above, CAT profited to the detriment of Venequip by, *inter alia*: (a) selling to dealers knowing they would sell into Venezuela despite repeatedly representing to and assuring Venequip that Venequip was the only authorized distributor in Venezuela and that CAT would not encourage, allow or facilitate sales by other dealers into Venezuela; (b) selling to dealers at significantly lower prices than Venequip knowing that those dealers were planning to and did indeed sell into Venezuela; (c) selling to resellers into Venezuela despite repeatedly representing to and assuring Venequip that CAT prohibited and would not facilitate sales by resellers; (d) selling to other dealers and/or resellers knowing they would sell to key Venezuelan clients such as PDVSA despite repeatedly representing to and assuring Venequip that CAT would aid Venequip in growing sales to such key customers and would not aid other dealers or resellers in invading the Venezuelan market; (e) violating Article 16 of Venezuela's Antitrust Law, as described below; and (f) all the while reaping the substantial intangible and monetary benefits of Venequip's multi-decades' efforts to promote the CAT brand in Venezuela, both for the provision of engines, heavy machinery and equipment, and for the servicing of those engines, heavy machinery and equipment.

---

[7] Artículo 1184. Aquél que se enriquece sin causa en perjuicio de otra persona, está obligado a indemnizarla dentro del límite de su propio enriquecimiento, de todo lo que aquélla se haya empobrecido.

[English Translation]

Article 1184. Whoever enriches itself without cause to the detriment of another person, is obligated to indemnify that person within the limit of its own enrichment, for everything that the person lost.

**WHEREFORE**, Venequip respectfully requests a final judgment against CAT, awarding Venequip disgorgement of CAT's profits in an amount to be determined at trial but not less than $100 million, and any such other or additional relief deemed just and proper.

### COUNT III: Violation of Article 16 of Venezuela's Antitrust Law

160.    Venequip incorporates herein paragraphs 1 to 151.

161.    Article 16 of Venezuela's Antitrust Law prohibits any disloyal, misleading, or fraudulent practice in production, distribution, and sale.[8]

---

[8] Artículo 16. Se prohíben las prácticas desleales, engañosas y fraudulentas en la producción, distribución y comercialización, en cualquiera de sus fases, por ser contrarias a la democratización económica y por ser capaces de desplazar en forma real o potencial, total o parcial, a los sujetos de aplicación de este Decreto con Rango, Valor y Fuerza de Ley, que realicen una misma actividad económica, en perjuicio de éstos, o de los ciudadanos y ciudadanas en el ejercicio de su derecho al acceso oportuno y justo a bienes y servicios.

La determinación de la existencia de una práctica desleal no requiere acreditar conciencia o voluntad sobre su realización. No será necesario acreditar que dicho acto genere un daño efectivo en perjuicio de otro competidor, de los consumidores o del orden público económico; basta constatar que la generación de dicho daño sea potencial, para que se apliquen las sanciones legales previstas en el ordenamiento jurídico que resulte aplicable.

Quedan prohibidos y serán sancionados en los términos del presente Decreto con Rango, Valor y Fuerza de Ley, los hechos, actos o prácticas desleales, cualquiera sea su forma, cuando dicha conducta tienda a impedir, restringir, falsear o distorsionar la competencia económica, atenten contra la eficiencia económica, el bienestar general y los derechos de los consumidores o usuarios y de los productores.

[English Translation]

Article 16. Disloyal, deceptive and fraudulent practices in production, distribution and sale are prohibited, in any of their phases, for being contrary to economic democratization and for being capable of actually or potentially, totally or partially, displacing the applicable subjects of this Decree with full force and effect, who carry out the same economic activity, to their detriment, or of citizens in the exercise of their right to timely and fair access to goods and services.

The determination of the existence of a disloyal practice does not require proving awareness or the intention to carry it out. It will not be necessary to prove that said act generates effective damage to the detriment of another competitor, consumers or economic public order; it is enough to establish that the generation of said damage is possible, in order to apply the legal sanctions provided for in the applicable judicial system.

Disloyal facts, acts or practices, whatever their form, remain prohibited and will be sanctioned under the terms of this Decree with full force and effect, when said conduct tends to prevent,

162.    CAT sold to and/or facilitated sales into Venezuela by other dealers and resellers in direct violation of repeated representations and assurances to Venequip, which is a disloyal, misleading and/or fraudulent practice. In particular, CAT: (a) sold to dealers knowing they would sell into Venezuela despite repeatedly representing to and assuring Venequip that Venequip was the only authorized distributor in Venezuela and that CAT would not encourage, allow or facilitate sales by other dealers into Venezuela; (b) sold to dealers at significantly lower prices than Venequip knowing that those dealers were planning to and did indeed sell into Venezuela; (c) sold to resellers into Venezuela despite repeatedly representing to and assuring Venequip that CAT prohibited and would not facilitate sales by resellers; and (d) sold to other dealers and/or resellers knowing they would sell to key Venezuelan clients such as PDVSA despite repeatedly representing to and assuring Venequip that CAT would aid Venequip in growing sales to such key customers and would not aid other dealers or resellers in invading the Venezuelan market.

**WHEREFORE**, Venequip respectfully requests a final judgment against CAT, awarding damages in an amount to be determined at trial but not less than $100 million, plus pre-judgment and post-judgment interest, and any such other or additional relief deemed just and proper.

Dated: July 9, 2024                    Respectfully submitted,

                                       **GREENBERG TRAURIG, P.A.**
                                       333 SE 2nd Avenue Suite 4400
                                       Miami, FL 33131
                                       Telephone: (305) 579-0500
                                       Facsimile: (305) 579-0717

                                       By: /s/ *Francisco O. Sanchez*
                                       **FRANCISCO O. SANCHEZ, ESQ.**
                                       Florida Bar No. 598445
                                       Sanchezfo@gtlaw.com
                                       **CARLOS  JOSE ANDREU COLLAZO, ESQ.**

---

restrict, falsify or distort economic competition, threaten economic efficiency, general well-being and the rights of consumers or users and producers.

Florida Bar. No. 1041252
carlos.andreucollazo@gtlaw.com

**GREENBERG TRAURIG, P.A.**
77 West Wacker, Suite 3100
Chicago, IL 60601
**GABRIEL AIZENBERG (**ARDC No. 6236614)
Aizenbergg@gtlaw.com
(*Pro Hac Vice Forthcoming*)


**GREENBERG TRAURIG, LLP**
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
Phone (305) 579-0500
**DANIEL PULECIO-BOEK (**D.C. 1500514)
(*Pro Hac Vice Forthcoming*)


*Counsel for Plaintiff*